IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | | |
|---|---|---|
| **CHARLI McCOY** | * | |
| **PLAINTIFF** | * | |
| **V.** | * | **CASE NO. 4:21CV00201 SWW** |
| | * | |
| **SJL AUTO GROUP NO. 1, LLC** | * | |
| **DEFENDANT** | * | |
| | * | |

**OPINION AND ORDER**

Charli McCoy ("McCoy") brings this action against SJL Auto Group No. 1, LLC ("SJL"), which operates car dealership Cowboy Chrysler Dodge Jeep Ram. The parties refer to Defendant SJL Auto Group No. 1, LLC as "Cowboy," and the Court will do the same. McCoy claims that Cowboy violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1961 *et seq* in attempting to sell her a car—a transaction that ultimately failed. She also brings supplemental state law claims for common law fraud, conversion, wrongful repossession, and violation of the Arkansas Deceptive Trade Practices Act.

Before the Court is Cowboy's motion for summary judgment (*Docs. 9, 10, 11*), McCoy's response in opposition (*Docs. 16, 17*), and Cowboy's reply (*Doc. 18*). After careful consideration, and for reasons that follow, the motion for summary judgment is granted as to McCoy's claims pursuant to TILA and ECOA,

1

and her supplemental claims pursuant to state law are dismissed without prejudice, pursuant to 28 U.S.C. § 1367(c)(3).

**I. Background**

Unless otherwise stated, the following facts are undisputed. On October 2, 2020, McCoy went to Cowboy's to purchase a car. Before arriving, she had decided to purchase a used, GMC Acadia and had a phone conversation with Cowboy's salesman, Ryan Tutor. With Tutor's assistance, McCoy completed a credit application. She acknowledges that she signed the application but recalls that Tutor entered the information based on her answers to his questions. *Doc. 16-5 at 21-22*.

McCoy's credit application listed her monthly income as $3,100, which was not the case. The application showed that she earned $1,200 from employment at "Cedar Lounge," plus $1,900 per month from a "written agreement." *Doc. 16-5 at 46*. In deposition, McCoy explained that her income from a "written agreement" referred to money she earned as a substitute teacher, which was considerably less than $1,900 per month. *Doc. 16-5 at 23*. She clarified that her earnings as a substitute teacher *plus* her earnings from the Cedar Lounge, brought her total monthly earnings to $1,900, not $3,100. *Id*.

McCoy understood, when she signed the credit application, that a potential lender would deny or approve a car loan based on the information set forth in the

application. *Doc. 16-5 at 23-24; Doc. 16 at 4.* And the credit application that she signed stated in part: "You understand and agree that you are applying for credit by providing the information to complete and submit this credit application. . . . You certify that the information on the application . . . is true and complete." *Doc. 11-3 at 2*.

Cowboy, not a lender, had no part in deciding whether McCoy would receive a car loan. Instead, Cowboy submitted McCoy's application to on online portal operated by nonparty Dealertrack, which transmitted the application to lenders, including Ally Bank. *Doc. 11-13 at 9.* A Dealertrack document titled "Decision Details," which Cowboy received in response to its submission, stated that Ally Bank had approved McCoy's application, with the stipulation of "proof of income." *Doc. 11-14 at 2.*

In addition to her credit application, McCoy signed (1) a retail buyer's order and (2) a retail installment sales contract. The buyer's order listed a total purchase price of $23,628, a down payment of $2,000, and $21,628.00 as the "unpaid cash balance due on delivery." *Doc. 11-6 at 2.* The buyer's order states:

> ALL DEALS SUBJECT TO FINANCE APPROVAL UPON COMPLETION OF CHECKING MY CREDIT BY THE FINANCE COMPANY OR BANK. I AGREE TO RETURN THIS VEHICLE TO COWBOY DODGE CHYRSLER JEEP RAM IF FOR ANY REASON MY CREDIT IS DENIED.

*Doc. 11-6 at 2.*

The installment contract that McCoy signed included a section, titled "FEDERAL TRUTH-IN-LENDING DISCLOSURES, setting forth the terms of financing, including a principal amount of $32,825.25, 25, financed over 75 months at an annual percentage rate of 14.29%. *Doc. 11-5 at 2*. Above McCoy's signature, the installment contract contains the following language in bold letters: "You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it." *Id. at 5*. McCoy gave Cowboy a $2,000 check for a down payment and drove the GMC Acadia home. On October 6, 2020, Cowboy deposited McCoy's $2,000 check.

According to Cowboy, McCoy's financing with Ally Bank subsequently failed because she did not verify the income reported on her credit application. McCoy does not recall whether Ally Bank ever contacted her after she left the dealership on October 2 (*Doc. 16-5 at 35-36*), but she acknowledges that Ally Bank sent her an adverse action notice dated October 22, 2020, stating in part as follows:

> We were recently informed by [Cowboy] that it was considering the credit sale or lease of a 2015 GMC ACADIA to you and asked whether we would be prepared to accept your obligation if the transaction was completed.
>
> We must regretfully inform you that we were not agreeable to handling the proposed transaction as submitted. We would, however, be agreeable to handling the transaction under the modified terms which

have been relayed to the dealer.

Doc. 11-12 at 2.

Cowboy attempted to secure other financing for McCoy through another lender, but she declined to sign a second installment contract, proposing a $2,000 down payment and a principal amount of $32,371.20, financed over 72 months at 12.99% APR. *Doc. 1 at 39*. McCoy refused to return the GMC Acadia to Cowboy. Cowboy then hired an investigator, who located the vehicle at an elementary school, where McCoy was working. The investigator contracted a towing service and took possession of the vehicle. By a check dated December 1, 2020, Cowboy reimbursed McCoy for her $2,000 down payment. *Doc. 1, at 53*.

## II. Discussion

### A. Truth-in-Lending-Act (TILA)

TILA requires that creditors disclose the terms of proposed financing to consumers, including the amount financed, the finance charge, the annual percentage rate, and the total sales price. 15 U.S.C. § 1638(a)(2). The goal of TILA is to provide "meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him . . . ." 15 U.S.C. § 1601(a).

The terms and conditions that a creditor must provide are listed under 15 U.S.C § 1638(a), and § 1638(b) covers the form and timing of disclosures. Actual and statutory damages are available under TILA, but the "distinction between

subsections (a) and (b) is important because 'a violation of subsection 1638(b)(1) does not trigger a grant of statutory damages.'" *Yancy v. Am.'s Preowned Selection LLC*, 658 F. App'x 824, 826 (8th Cir. 2016) (quoting *Wojcik v. Courtesy Auto Sales, Inc.*, No. 8:01CV506, 2002 WL 31663298, at *5 (D. Neb. 2002) and citing 15 U.S.C. § 1640(a)(4)).

McCoy claims that Cowboy violated TILA's requirements by (1) failing to give her a copy of the installment contract that she could keep when she became obligated under the contract; (2) failing to provide her a "spot delivery" agreement required under Arkansas law; and (3) failing to identify TILA disclosures as estimates. The Court addresses each claim and related arguments separately.

    **1.    Failing to Provide a Copy of the Installment Contract**

TILA, under subsection 1638(b)(1), provides that disclosures required under subsection (a) must be made "*before* the credit is extended." 15 U.S.C. § 1638(b)(1) (emphasis added). Similarly, TILA's implementing regulation, Regulation Z, requires creditors to make the disclosures "before consummation[1] of the transaction" *and* "in a form that the consumer may keep." 12 C.F.R. § 226.17(b) (first quote); § 2261.17(a)(1) (second quote). Official Staff Commentary to Regulation Z clarifies how a creditor can comply with these requirements when, as in this case, TILA

---

[1] Regulation Z defines "consummation" as the "time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13).

disclosures are set forth in an installment sales contract that the consumer must sign:

> Sometimes the disclosures are placed on the same document with the credit contract. The disclosure requirement is satisfied if the creditor gives a copy of the document containing the unexecuted credit contract and disclosures to the consumer to read and sign; and the consumer receives a copy to keep at the time the consumer becomes obligated. It is not sufficient for the creditor merely to show the consumer the document containing the disclosures before the consumer signs and becomes obligated. The consumer must be free to take possession of and review the document in its entirety before signing.

12 C.F.R. § Pt. 226, Supp. I, Subpt. C.

Cowboy contends it complied with subsection 1638(b)(1) by providing McCoy a copy of the installment contract with TILA disclosures, before consummation of the transaction, that she could read and sign. The Court agrees that giving McCoy an opportunity to read the contract before she signed complied with Cowboy's duty to make TILA disclosures *before* consummation of the transaction. But McCoy does not dispute that she received a copy of the contract to read and sign; she argues that she "did not leave the Cowboy car lot with a copy," *Doc. 17 at 5*.

Cowboy provides no evidence that McCoy received a signed copy of the installment contract that she could keep. However, assuming that Cowboy violated § 1638(b)(1) by failing to give McCoy a copy of the contract to keep "at the time she became obligated," her remedy is limited to actual damages. McCoy does not contend and cannot show that she suffered actual damages because she did not

have a copy of the *executed* contract when she left the dealership. She accepted the terms of Ally Bank's proposed financing at the dealership and signed the contract. She elected not to shop elsewhere and compare credit terms available from other lenders. Because McCoy cannot prove actual damages, there are no genuine issues for trial on this claim.

  2. **Failing to Provide a Spot Delivery Agreement**

Arkansas Code § 23-112-316(b) generally requires that if a dealership delivers a vehicle to a consumer prior to the execution of a contract for sale, also known as a "spot delivery," the dealer must provide the consumer a separate agreement containing specified terms, including that the consumer may cancel the sale if the dealer changes any terms or the consumer fails to obtain financing at the agreed rate. McCoy argues that Cowboy's failure to provide her such an agreement and treating the sale as conditional violated TILA.

To support her argument, McCoy cites decisions holding that TILA disclosures were rendered meaningless when the consumer received a spot delivery agreement, along with fully integrated installment contract containing TILA disclosures. *Salvagne v. Fairfield Ford, Inc.*, 794 F.Supp.2d 826, 832 (S.D. Ohio 2010); *Patton v. Jeff Wyler Eastgate, Inc.*, 608 F.Supp.2d 907, 915 (S.D. Ohio 2007). This is not a case where TILA disclosures were contradicted by a separate spot delivery agreement. Instead, the undisputed facts show that Ally Bank

approved the financing terms set forth in the installment contract, with the stipulation that McCoy provide proof of the income, which she could not do.[2]

McCoy disputes that Ally Bank approved financing with the stipulation that she provide proof of income, but she presents nothing to counter evidence showing otherwise. She notes that Cowboy's salesman, Ryan Tutor, told her she had been approved for financing.[3] However, according to McCoy's own testimony, she knew that Ally Bank was the lender (*Doc. 16-5 at 23-24*) and that approval of her credit application depended on the accuracy of income information that she submitted on that document (*Id. at 24*), which was not accurate. *Id. at 23*.

The condition that McCoy verify her reported income did not render the TILA disclosures inaccurate or meaningless. Furthermore, even if the transaction

---

[2] In deposition, McCoy recalled that she provided bank statements while present at the Cowboy dealership on October 2, 2020. *Doc. 11-2 at 12*. However, it is undisputed that the bank records did not confirm the monthly income reported on her credit application. *Compare Doc. 11, with ¶ 18, Doc. 16, ¶ 18*. In addition, McCoy has acknowledged that she did not earn the monthly income reported on her credit application. *Doc. 16-5 at 23*.

[3] In addition, McCoy cites the deposition testimony of Cowboy's finance manager, Dylan Mattingly, and general manager, Dustin Curtis, as evidence that financing had been approved without condition. However, Mattingly testified that Ally Bank had approved McCoy for financing "based on the information she provided[,]" and when she was unable to verify the information on her credit application, "it blew up and skyrocketed." *Doc. 13-13 at 13, 4*. Curtis testified, "She would've been approved, or we would never have delivered the vehicle[,]" but he added: "contingent on whatever - - you know, whatever she provided on the credit app." *Id. at 11-9 at 8*.

qualified as a spot delivery, Cowboy's failure to provide McCoy a spot delivery agreement, required under *Arkansas* law, did not violate TILA. *See Janikowski v. Lynch Ford, Inc.*, 210 F.3d 765, 769 (7th Cir. 2000) (holding that spot-delivery transactions based on conditional financing do not violate TILA).

### 3. Failing to Identify the TILA Disclosures as Estimates

McCoy argues that the Cowboy's "demand" that she execute a second installment contract two weeks after she signed the first shows that the TILA disclosures were merely estimates "because the precise APR [could not] be computed." *Doc. 17 at 6*. TILA requires that disclosures "reflect the terms of the legal obligation of the parties[,]" 12 C.F.R. § 226.17(c)(1), and labeled as estimates when "any information necessary for an accurate disclosure is unknown to the creditor." 12 C.F.R. § 226.17(c)(2)(i). However, if TILA disclosures are "subsequently rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation." 15 U.S.C. § 1634.

The TILA disclosures in this case were based on the expectation that McCoy would qualify for financing by providing proof of the income reported on her credit application. The APR disclosed in the contract was not an estimate, and if the financing condition had been satisfied, McCoy would have been entitled to that rate.

### B.      Equal Credit Opportunity Act (ECOA)

McCoy charges that Cowboy violated ECOA by failing to issue her an adverse action notice. The ECOA provides that "each applicant against whom adverse credit is taken shall be entitled to a statement of reasons for such action from the creditor." 15 U.S.C. § 1691(d)(2).  "Under this provision, [Cowboy] would be liable to [McCoy] if (1) [Cowboy] is a "creditor," (2) [Cowboy] took "adverse action" with respect to [McCoy's] . . . credit application, and (3) [Cowboy] failed to provide [McCoy] written notification of its reasons for adverse action. *Madrigal v. Kline Oldsmobile, Inc.*, 423 F.3d 819, 822 (8th Cir. 2005).  Cowboy asserts that McCoy is unable to meet any one of these required elements.  The Court finds that McCoy's claim fails because even if Cowboy qualified as a creditor, Cowboy did not take adverse action with respect to McCoy's credit application.

For purposes of the adverse notice requirement, ECOA defines "adverse action" as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested."  15 U.S.C.A. § 1691(d)(6). Here, the undisputed facts show that Ally Bank, not Cowboy, made the decision to deny McCoy's credit application; Ally Bank, not Cowboy set the terms of financing; and Ally Bank, not Cowboy, provided McCoy notice of its adverse action.

In sum, the Court finds no triable issues as to McCoy's claims under the Truth

in Lending Act or the Equal Credit Opportunity Act, and Cowboy is entitled to judgment in its favor on these claims.

### C. Supplemental State Law Claims

For the reasons stated, all claims over which the Court has original jurisdiction will be dismissed with prejudice. Pursuant to 28 U.S.C. § 367(c)(3), the Court declines to exercise supplemental jurisdiction over McCoy's state law claims.

### III. Conclusion

IT IS THEFORE ORDERED that Defendant's motion for summary judgment (Doc. 9) is GRANTED IN PART AND DENIED IN PART. Pursuant to the judgment entered with this order, Plaintiff's claims under the Truth in Lending Act and the Equal Credit Opportunity Act are DISMISSED WITH PREJDUICE, and Plaintiff's remaining state law claims are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c)(3). Defendant's motion for order to show cause (Doc. 15) is denied as moot.

IT IS SO ORDERED, this 26th day of January, 2022.

Susan Webber Wright  
UNITED STATES DISTRICT COURT